UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-CR-255-MOC-DCK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| | ) | |
| Vs. | ) | **ORDER** |
| | ) | |
| **TRACY LAWSHAWN PLANTER**, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. Nos. 13, 30). Having considered Defendant's motion, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following findings, conclusions, and Order denying Defendant's motion.

**FINDINGS AND CONCLUSIONS**

## I.   PROCEDURAL BACKGROUND

On November 14, 2023, Defendant was charged by Bill of Indictment with possession of a firearm by a felon after police discovered a 9mm Glock pistol with an extended magazine in the trunk of Defendant's vehicle. Defendant has moved to suppress the evidence found incident to the search. The Government has responded in opposition to the motion. (Doc. No. 18). The Court held a hearing on the motion on November 6, 2024. This matter is ripe for disposition.

## II.   FACTUAL BACKGROUND

On August 16, 2023, at around 5:30 p.m., multiple CMPD officers responded to an accident involving three vehicles at the intersection of Statesville Avenue and Holland Avenue. Upon arrival, Officers Jackson and Eagle observed a BMW and Mazda SUV at or near the intersection,

and a silver Chrysler sedan (later identified as belonging to Defendant) parked a short distance down the road, all with varying degrees of body damage. Officers Jackson and Eagle observed that Defendant's car was completely blocking the inner north-bound lane of Statesville Avenue, and that other law enforcement personnel (sheriff's deputies) were already present, directing traffic to use the outer lane and avoid the accident site. As Officer Eagle approached Defendant's vehicle, and before speaking with him, he called out to Officer Jackson, "Hey, can you find out about Hunter," referring to Hunter Wrecker, an automobile towing and wrecker company. (Eagle Body Worn Camera ("BWC") 17:41:18).[1]

While Defendant was telling Officer Eagle that he was struck on the side by another vehicle that purportedly fled the scene, another individual could be heard saying, "going to need Hunter for this one," in reference to Defendant's vehicle. (Eagle BWC 17:42:31). Officer Eagle then confirmed the vehicle was registered to Defendant and reviewed his driver's license. Meanwhile, Officer Jackson was speaking with the driver of the BMW, who stated that a Chrysler sedan struck him from behind and pushed him into the Mazda, which then caused him to go up on the median.

After recording Defendant's contact information, Officer Eagle walked away from Defendant and his vehicle, approached Officer Jackson, and made a statement to the effect of "I'm going to go off real quick talk to you"—then turned his BWC off. (Eagle BWC 17:45:17). Officer Eagle also instructed Officer Jackson to turn his BWC off, and Officer Jackson complied (Jackson BWC 17:45:23). Their cameras were off for about a minute, during which time officers

---

[1] All citations are to the timestamp in the BWC footage for each officer.

discussed investigative steps and strategy, including Defendant's behavior—which Officer Jackson described as "nervous," and "acting uneasy." (See Doc. No. 18-1).

Officers reactivated their BWCs, Officer Eagle went to speak to the driver of the Mazda SUV, and Officer Jackson returned to the BMW and briefly spoke with its driver. Officer Eagle then joined Officer Jackson at the BMW. He told Officer Jackson that they needed a tow truck for both the Chrysler and the BMW, but that he thought the Mazda was drivable. (Eagle BWC 17:50:49). Officer Eagle then returned to the BMW and said, "It's on a curb so I'm assuming…" and asked if he needed to have the car towed. (Eagle BWC 17:50:56). The BMW driver responded, "Yes." Officers Jackson and Eagle then walked back to a police cruiser. On the way to the cruiser, Officer Jackson said something to the effect of "who do you think is going to do the tow forms," to which Officer Eagle replied "I don't know." Officer Jackson said, "you don't have them" and Officer Eagle said "I do … in the back right there," gesturing to the cruiser. (Eagle BWC 17:51:18). Officer Jackson said, "I don't know why you're angry with me," and Officer Eagle said, "you're trying to make me look bad," to which Officer Jackson replied, "no." (Eagle BWC 17:51:26).

Officer Jackson then opened the driver's door of the cruiser, and the officers deactivated their BWCs. During this time, officers were presumably following standard crash investigation protocol by: (a) running the information of all three drivers; (b) entering their vehicle and insurance information in the system; (c) printing copies of the CMPD Owner Information Exchange Form to provide to the drivers, which included the officers' information and the complaint number (to be used to request a copy of the DMV-349 accident report); and (d) filling out preliminary portions of the tow inventory sheet. Officer Jackson also believes this is when he learned, via CJ Leads, that Defendant had a criminal record.

Defendant was alone with his vehicle during this time, for approximately 20 minutes: from the time officers first deactivated their BWCs at approximately 17:45:17, until Hunter Wrecker arrived. At that point, Officer Jackson, who had reactivated his BWC, returned to Defendant, who was then seated in the Chrysler's driver's seat with the door closed. BWC footage shows Officer Jackson approaching Defendant holding a City of Charlotte Tow / Storage Report (a/k/a the "inventory sheet") with the preliminary information related to the wreck filled out. (Jackson BWC 18:11:00). Officer Jackson told Defendant, "All right boss man, so because we got to tow your car you got to take whatever it is you want to go with you out of it because we got to take inventory of it make sure nothing gets missing, you know what I'm saying…." Defendant nodded. (Jackson BWC 18:11:00).

Officer Jackson again asked Defendant if he wanted to get anything out of the car, and Defendant told him he wanted to get his personal things. Defendant then started talking about the wreck again. Officer Jackson said something to the effect of "because the tow truck's here we got to get this car out of here, just go ahead and get your stuff out of it." (Jackson BWC 18:12:42). Defendant appeared slightly agitated and told officers that he needed to figure out how to get home. (Jackson BWC 18:12:50). Officer Jackson replied, "We may be able to work out a ride for you." (Jackson BWC 18:12:58).

Defendant continued talking about how the wreck happened. During this exchange, Officer Eagle returned to Defendant's vehicle. Officer Garcia had arrived at the crash site and first parked his cruiser in the northbound innermost lane, near—but not blocking—Defendant's Chrysler. (Eagle BWC 18:11:20). Then, at Officer Eagle's direction, and with his assistance stopping traffic, Officer Garcia backed up his cruiser and parked behind Defendant's Chrysler, (Eagle BWC 18:11:48), presumably to make room for Hunter Wrecker. Officer Eagle then

4

joined Officer Jackson at Defendant's vehicle, where Defendant was still standing next to his car, talking about how the wreck happened. (Eagle BWC 18:12:10). Eventually, Defendant got into his car and shut his door. Officers Eagle and Jackson walked briefly to Officer Garcia's cruiser. Officer Eagle said, "I'm going to let him get his stuff out of the car," as they walked back to Defendant. (Eagle BWC 18:14:05).

Officer Eagle then called to Defendant through the open driver-side window and asked him, again, to get his stuff and get out of the car. (Eagle BWC 18:14:15). Defendant responded that he was on the phone trying to get a ride home. Officers asked Defendant to step out of the car so they could talk to him, and he did. (Eagle BWC 18:14:30). Officer Jackson then asked Defendant if he could "pop the trunk … so I can make sure that I get down write down everything that's in the trunk I got to take inventory of the car," and Officer Eagle interjected, "because it's being towed." (Eagle BWC 18:14:40). Defendant said, "It's being towed?" and Officer Eagle said, "you can't drive it … the tow truck is here." Defendant said, "I understand I can't drive it but… (unintelligible) … I've got nothing to hide." (Jackson BWC 18:14:49). Officer Jackson again explained that they had to take an inventory of the car for it to get towed: "but we have to take inventory of the car for it to get towed … because we want to make sure everything you have is in there, is in there when you go pick up the car." (Jackson BWC 18:15:10). Defendant said he understood and, after further conversation, entered his vehicle to retrieve his credit cards. (Jackson BWC 18:15:18).

While this was going on, Officer Eagle began inspecting the interior of Defendant's car through the front passenger side window with his flashlight. While Defendant was getting his things (and walking around his car talking on the phone), the officers discussed among themselves an open beer container Officer Eagle observed in the car. (Jackson BWC 18:15:38).

Officer Eagle then walked over to Defendant to explain the inventory form, and that officers had to take an inventory because Hunter Wrecker was coming; Officer Eagle said: "this form … nobody is saying you did anything wrong," and "he has to get inventory of the car because Hunter Wrecker is coming so when we tow the car, on the tow form it has to say what all is in the car … we have to take inventory of it when it is towed ok …. I'm giving you an accident statement I gave the other two this same sheet of paper … gave the other two the same sheet of paper…." (Garcia BWC 18:16:55).

While Officer Eagle and Defendant were talking, Officer Jackson pulled an open, empty bottle of Budweiser from behind the driver's seat. (Jackson BWC 18:17:08). He then entered the vehicle and searched the driver's side with a flashlight, looking around the floorboards and into the backseat passenger compartment. He searched the rest of the interior of the vehicle and found an open can of Icehouse beer under the front passenger seat.

During the search, Defendant complained that he did not see any of the other cars involved in the accident get searched. Officers responded that they also took an inventory of the BMW because it was being towed and again explained that the inventory was "for you." (Eagle BWC 18:17:42). Officer Eagle then left Defendant's car and walked to the tow truck, which was in the process of loading the BMW. He told the tow operator that he needed "two seconds," opened the BMW's rear passenger side, and, using his flashlight, conducted an inventory search of the BMW's interior and trunk. (Eagle BWC 18:18:35). Officer Eagle verbally noted the presence of debris from the accident and no personal effects. At this point, it appeared that the driver of the BMW had already left the scene.

While Officer Eagle was doing the inventory search of the BMW, Officer Jackson, Officer Garcia, and Defendant discussed the issue of open containers. Defendant stated "it" was

not his. Defendant also stated that he understood the officers' explanation about the tow and search, but that he felt like "he" (presumably, Officer Jackson) wanted to search his car "because he may feel like I got something in my car that I'm not supposed to have." (Garcia BWC 18:18:30). Officer Garcia said, "Well, like you just said, that is illegal … so now we've gone beyond taking an inventory and now he's actually looking at the car because you just said that's illegal you just agreed that's illegal," and they continued talking about the open beer can. Officer Garcia again said that having an open beer container was illegal and that Officer Jackson was looking to make sure there was nothing else in there.

Officer Eagle returned to Defendant's vehicle. He again advised Defendant to call his insurance company and explained how to obtain a copy of the police report. (Eagle BWC 18:20:49). Defendant then stated that Officer Jackson found a beer in his car, but it was not his, and he had not been drinking. Defendant then offered to take an "alcohol test." Officers declined the invitation to test him for alcohol and/or intoxication, and repeatedly told Defendant no one was accusing him of being drunk. The officers explained to Defendant that he was not being charged in connection with the open containers. Officer Jackson then resumed his original course of conduct—the inventory search—to document Defendant's personal effects so the vehicle could be towed out of the roadway. Officers filled out a tow inventory form based on items Officer Jackson observed during his search of the passenger compartment, noting an oil pan, clothes, and other personal effects. (Jackson BWC 18:22:24). Officer Jackson then went around to the driver's side, reached into the interior near the floorboards, popped the trunk, and walked around to the back of the car and lifted the trunk open. (Jackson BWC 18:23:29). During this time, Defendant appeared to become more agitated and continued talking about the search of his car and trunk.

Officers searched the trunk, noting the presence of clothes, shoes, and water. Officer Jackson then lifted the trunk mat/floor/cargo liner (i.e. the covering over the spare tire well), replaced it, and told Officer Eagle to "put him in cuffs" and Officer Eagle responded in a surprised tone, "are you serious?" Defendant was then arrested. (Jackson BWC 18:24:19). Officer Eagle lifted the trunk mat/floor/cargo liner and Officer Jackson retrieved a firearm from the wheel of the spare tire. Officer Jackson removed the loaded extended magazine from the firearm, checked the chamber and confirmed there was not a round in the chamber, and identified it as a Glock 17.

Officer Jackson called the gun in and put it in an evidence bag. At this point, someone remarked that Defendant was a criminal gang member. Officer Jackson continued to search in and around the spare tire and located a spent shell casing for a 9mm Luger FC under the tire, which was also collected as evidence. Officer Garcia asked, "so felonious firearm?" to which Officer Eagle responded "possibly, yes … I think he is, we have to confirm that ... yes, he is." Defendant's vehicle was then towed.

## III.   DISCUSSION

On a motion to suppress, the burden of proof is on the party seeking to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his suppression motion, the burden shifts to the Government to prove the admissibility of the challenged evidence by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. Amend. IV. However, rather than "proscrib[ing] all contact between the police and citizens," I.N.S. v. Delgado, 466 U.S. 210, 215 (1984), the Fourth Amendment "prevent[s] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." Id. (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). The Fourth Amendment prohibits a warrantless search or seizure unless it falls within an exception to the warrant requirement. See Horton v. California, 496 U.S. 128, 134 n.4 (1990).

In Cady v. Dombrowski, 413 U.S. 433 (1973), the Supreme Court articulated a well-known exception to the Fourth Amendment's warrant requirement known as the community caretaking doctrine. The community caretaking doctrine allows law enforcement officers to seize and remove without a warrant any vehicles that may be impeding traffic or threatening the public safety. Unlike federal officers, local police officers frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what are described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. Cady, 413 U.S. at 441. In United States v. Newbourn, the Fourth Circuit similarly recognized that a police officer serving as a community caretaker to protect persons and property is constitutionally permitted to make searches and seizures without a warrant. 600 F.2d 452 (4th Cir. 1979) (finding warrantless search of vehicle's trunk lawful as a protective search under Cady, and under the automobile exception). Notably, in the context of non-criminal police contacts with motorists and their vehicles, the Newbourn Court opined:

> …that anyone who drives a vehicle upon the public streets and highways surrenders a substantial expectation of privacy. The officers' motivation should not enlarge the motorist's diminished expectation. Indeed, in the inventory search situation, the police must know that sometimes dangerous instruments or substances or evidence of crimes will be uncovered. They may have more or less

reason to believe that some such thing may be found in a particular car, but the right to conduct the inventory ought not to vanish if the reason be more rather than less.

Newbourn, 600 F.2d at 455; see also United States v. Johnson, 410 F.3d 137 (4th Cir. 2005) (holding officer who responded to a car accident was performing a community caretaking function when he opened the glove compartment).

In evaluating the legality of law enforcement's decision to tow a vehicle, courts should consider: (1) whether the department policy authorizing the tow was based on community caretaking or criminal investigation considerations; and (2) whether the officers complied with the policy. United States v. Marshall, 747 F. App'x 139, 145–46 (4th Cir. 2018) (unpublished) (holding officers acted reasonably in towing the absent owner's vehicle). The ultimate question is whether the officers' decision to tow the vehicle was a reasonable exercise of a police community caretaking function. Id. (citing Cady, 413 U.S. at 441–47); see also Caniglia v. Strom, 141 S. Ct. 1596 (2021) (recognizing law enforcement's community caretaking functions of responding to disabled vehicles and motor vehicle accidents and noting that, in the Fourth Amendment context, what is reasonable for vehicles differs from what is reasonable for homes); United States v. Treisman, 71 F.4th 225 (4th Cir. 2023) (holding warrantless searches of vehicles carried out as part of law enforcement's community caretaking functions do not violate the Fourth Amendment if they are reasonable under the circumstances); United States v. Fort, 313 Fed. Appx. 665, 668 (4th Cir. 2009) (unpublished) ("[B]ecause the police did not violate any clear directives under their towing and inventory policy and there is no evidence that the search was initiated by an investigatory motive, we find that the officers did not abuse their discretion and that the decision to have Fort's vehicle towed and inventoried was reasonable."); see also

Johnson, 410 F.3d at 145 (noting if the officer's reasons were pretextual or the officer acted in bad faith, the community caretaking exception would not apply).

Particularly, with respect to the assessment of the reasonableness of the decision to tow, courts have considered: (1) the circumstances and justification for the decision to tow or impound the vehicle, Fort, 313 Fed. Appx. at 667; (2) whether, based on the information available, the law enforcement officer acted within his or her discretion under the applicable policy in determining it was necessary to tow the car, Id. (citing Colorado v. Bertine, 479 U.S. 367, 375 (1987) ("so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity")); and (3) where a one-size-fits-all application of the standard procedures was not feasible, whether officers "in light of the unusual circumstances, 'acted in accordance with standard procedures more generally.'" Id. (quoting United States v. Banks, 482 F.3d 733, 740 (4th Cir. 2007)); see also Triesman, 71 F.4th at 235–36 (finding that the officers' deviation from standard policy was reasonable under the circumstances in light of public safety concern presented by visible and unsecured firearms); United States v. Pollard, No. CR 9:21-292-RMG, 2022 WL 981179, at *3 (D.S.C. Mar. 31, 2022) (rejecting defendant's bid to suppress evidence based on minor deviation from policy where officers documented the vehicle inventory on incident report rather than on a tow sheet) (citing United States v. Bullette, 854 F. 3d 261, 265 (4th Cir. 2017)).

Inventory searches are another clear exception to the Fourth Amendment warrant requirement. Colorado v. Bertine, 479 U.S. at 374 ("[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure."). An inventory search is a routine administrative procedure designed to

effect three distinct purposes: (1) protection of the owner's property which may be stored in the vehicle; (2) protection of the police against claims of lost, stolen, or vandalized property; and (3) protection of the police from potential danger. South Dakota v. Opperman, 428 U.S. 364, 369 (1975).

For the inventory search exception to apply, "the search must have been conducted according to standardized criteria, such as a uniform police department policy . . . and performed in good faith." United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009) (internal quotation omitted). "The existence of a standardized criteria may be proven by reference to either written rules and regulations or testimony regarding standard practices." Id. (internal quotation and alteration omitted). Importantly, "nothing prohibits the discretion of police officers in making inventory searches so long as that discretion is based on standard criteria and on the basis of something other than the suspicion of criminal activity." United States v. Ford, 986 F.2d 57, 60 (4th Cir. 1993) (citing Bertine, 479 U.S. at 375).

Fourth Amendment requirements are violated when, considering the totality of the circumstances, an inventory search is unreasonable. See Opperman, 428 U.S. at 373–75 (explaining that inventory searches of lawfully impounded vehicles fall within officers' caretaking functions and are reasonable under the Fourth Amendment even if conducted without a warrant "where the process is aimed at securing or protecting the car and its contents"); see also Johnson, 410 F.3d at 146 ("However, the community-caretaking exception is not limited to the least intrusive means of protecting the public … '[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable.'") (quoting Cady, 413 U.S. at 447).

With respect to how officers carried out the inventory search, courts have viewed the reasonableness of the search in the context of its purpose—for example, to provide officers with knowledge of the vehicles contents to avert danger to police or others, or to protect the owner's property interests. See Ford, 986 F.2d at 60; United States v. Bland, 23 F.3d 403, at *1 (4th Cir. 1994) (unpublished) (in context of ineffective assistance of counsel claim, finding a proper search where law enforcement, in preparing to tow defendant's car, which was inoperable and blocking traffic as the result of an accident, discovered crack cocaine and a handgun during the "routine administrative procedure" of the inventory search); United States v. Brown, 849 Fed. Appx. 65, 66 (4th Cir. 2021) (unpublished) (affirming denial of suppression motion where officer had already called a tow company and was preparing to conduct an inventory of the vehicle by filling out a required tow sheet—conduct which was mandatory under the department's towing policy—when he observed the firearm); see also State v. Brill, 190 N.C. App. 674, at *5 (2008) (unpublished) (finding the officer's decision to tow and conduct inventory search reasonable pursuant to similar written policy directives).

Here, Defendant's primary arguments for suppression are that: (1) officers violated his Fourth Amendment rights by performing an unlawful "traffic accident stop"; (2) officers violated his Fourth Amendment rights by ordering the towing of his disabled car from the accident scene without obtaining his express permission to do so; and (3) officers violated his Fourth Amendment rights by performing an investigative search without probable cause or a warrant, under the guise of an inventory search. For the following reasons, the Court finds that the officers' actions did not violate the Fourth Amendment.

First, Defendant argues that "officers initially seized [Defendant] by initiating a traffic accident stop." (Doc. No. 13 at 12). As the Government notes, however, there is no such thing as

a "traffic accident stop." Law enforcement's response to a motor vehicle crash is widely recognized as a routine activity—a noncriminal procedure related to ensuring public safety and welfare. Thus, where, as here, officers do not initiate or conduct a traffic stop, there is no seizure within the meaning of the Fourth Amendment and no "constitutionality" to review under the framework of Terry v. Ohio, 392 U.S. 1 (1968) and its progeny.

Here, in responding to the wreck, Officer Eagle observed through an open window what appeared to be an open alcohol container in the passenger compartment of Defendant's vehicle. This, combined with officers' earlier observations of Defendant's erratic behavior, gave officers probable cause to believe the vehicle contained evidence of criminal activity—particularly, a North Carolina open container violation and/or driving under the influence. During the search of the passenger compartment, officers removed an empty can of Budweiser from behind the driver's seat and an open can of Icehouse beer under the front passenger seat. Officers also noted the presence of spilled beer in the passenger side front and rear compartments of Defendant's vehicle. Significantly, officers did not discover the firearm during this search.

Ultimately, officers declined to pursue further investigation or charges related to open containers violations and/or driving under the influence. Officer Jackson explained to Defendant that he was not being charged with any such crimes. The investigation into any alcohol-related offenses was over, and officers no longer had probable cause to search the vehicle. At that point, Officer Jackson resumed his original task of conducting an inventory search to document Defendant's personal effects, filling out the required inventory form, and getting the car towed.

The firearm was not located during officers' search of the passenger compartment of Defendant's vehicle. BWC footage demonstrates that officers did not open or search the trunk during their investigation of potential open container violations. Only after that brief

14

investigation was complete, when Officer Jackson inventoried the contents of Defendant's trunk, did law enforcement locate the firearm. In sum, the initial search of Defendant's car was not an unconstitutional seizure.

Second, Defendant argues that officers violated his Fourth Amendment rights by ordering his car towed without his express permission. However, the officers towed Defendant's Chrysler consistent with CMPD policy because it was creating a hazardous condition by obstructing rush-hour traffic and, therefore, needed to be promptly removed from the street for the public's safety. Here, the officers "were simply reacting to the effect of an accident—one of the recurring practical situations that results from the operation of motor vehicles and with which local police officers must deal every day." Cady, 413 U.S. at 446.

Officers towed Defendant's vehicle pursuant to CMPD Directive 600-13 Towing Vehicles. The CMPD Directive provides in pertinent part that CMPD officers may authorize the towing of vehicles when one or more specified conditions exist, including: "[w]hen a disabled vehicle is creating a hazard or obstructing traffic." (see Doc. 13-11 at § IV. A. 4). In this situation, officers are encouraged to attempt to contact the vehicle's registered owner but are not required to do so. (Id.). Nothing in the Directive requires officers to obtain the owner's consent or permission to tow when a disabled vehicle is creating a hazard or obstructing traffic. The policy further provides for the officers' conducting "an inventory of the interior and trunk areas and record[ing] all property in the vehicle." (Id. at § IV(A)(4)).

The officers clearly complied with the policy. Moreover, despite Defendant's argument to the contrary, the policy does not give Defendant the right to authorize his own car's tow, nor does it prevent law enforcement from initiating a tow. In any event, when Defendant was initially advised that a towing company had been called to tow his vehicle, he nodded

affirmatively, and he did not ask to order his own tow. Defendant has simply failed to proffer any facts showing that the officers' intent when they ordered the tow was anything but innocuous. Within minutes of Officer Jackson's initial encounter with Defendant, another officer can be heard saying "going to need [the towing company] for this one"—clearly referring to Defendant's wrecked and disabled vehicle. Defendant has also offered no evidence suggesting that officers had reason to believe that the decision to tow and conduct the associated inventory search of the vehicle's trunk would produce evidence of criminal conduct. Here, the officers were clearly exercising their community caretaking function in conformity with CMPD policy and procedure when they ordered the tow. The Court finds that the officers' conduct was reasonable within the meaning of the Fourth Amendment.

Third, Defendant argues that officers violated his Fourth Amendment rights by performing an investigative search without probable cause or a warrant, under the guise of an inventory search. The inventory search here was reasonable in that it was an administrative function conducted in accordance with CMPD's written directive and performed in good faith. CMPD Directive No. 500-004-C sets forth the Department's policy related to conducting vehicle searches. CMPD's policy states in pertinent part that "[a]ny officer having a vehicle towed will conduct an inventory of the interior and trunk areas in order to record all property in the vehicle." Doc. No. 13-13, CMPD Directive 500-004 IV D. 1). As discussed, Officers Jackson and Eagle repeatedly advised Defendant that he needed to get his personal effects out of the vehicle and explained that the purpose of the inventory was to ensure that none of his belongings went missing. With respect to the trunk, Officer Jackson specifically told Defendant—before opening it—that officers "want to make sure everything you have is in there when you go to pick up the car." Officer Eagle similarly discussed the purpose of the inventory search with Defendant and

made statements such as "nobody is saying you did anything wrong," and "when we tow the car, on this form it has to say what all is in the car … we have to take inventory of it when it is towed. I'm giving you this sheet of paper," which was referring to the inventory sheet. Officers completed an inventory sheet following the completed search of Defendant's vehicle. (Doc. No. 13-10).

That Officer Garcia incorrectly told Defendant that the search of his vehicle and trunk was legal because officers found open containers did not render the search unlawful. Officer Garcia arrived on scene after Officers Jackson and Eagle and played only a supporting role in the wreck investigation. Officer Garcia was not present for, nor was he involved in, the earlier decision made by Officers Jackson and Eagle to tow the car and conduct the inventory search. His observations and legal opinions while on scene are not material to the reasonableness of Officers Jackson and Eagle's decision to order a tow, nor the manner in which his colleagues performed the search.

Defendant argues that certain conduct by law enforcement at the scene supports his contention that the tow and/or inventory search was mere pretext for a search unsupported by probable cause, and that officers did not otherwise act in good faith. Defendant urges this Court to infer that the officers' true intent was to search for proof of criminal wrongdoing based on the following: (1) that officers could have left it up to Defendant to order his own tow truck but did not; (2) that the search of Defendant's Chrysler took longer than the search of the BMW; (3) that officers purportedly treated the white driver of the BMW differently than Defendant; (4) that officers deactivated their BWC in contravention of CMPD policy; (5) that officers unreasonably delayed providing a copy of the accident report to Defendant; and (6) that officers failed to investigate the fourth vehicle that Defendant claimed had caused the wreck and whose driver had

fled the scene. As the Government discusses in its opposition brief and as discussed at oral argument, many of Defendant's contentions are factually inaccurate or legally irrelevant. Ultimately, none of this purported conduct supports a reasonable inference that officers used the need to move Defendant's disabled vehicle and adherence to the inventory search policy as pretext for a search for evidence of an unknown crime.

As to Defendant's contention that the officers could have allowed Defendant to tow his own vehicle, the Court has already addressed and rejected this argument. Next, as to Defendant's argument that it took officers longer to complete than the inventory search of the BMW, the BWC footage depicting the inventory searches of both vehicles demonstrates that the BMW was essentially devoid of personal effects, and contained only crash debris,[2] which allowed for a faster inventory search. It is not reasonable to infer that the amount of time it took to search the Defendant's Chrysler as compared to the search of the BMW is evidence of pretext or bad faith. Nor is this argument grounded in the law.

Defendant also argues that he was treated differently from the BMW driver, who was a white male. Allegations of racially motivated law enforcement action implicate the Equal Protection Clause rather than the Fourth Amendment. United States v. Suarez, 321 F. App'x 302, 305 (4th Cir. 2009) (citing United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996)). In any event, the "discrepancies" Defendant points to do not—as Defendant states—"paint a picture of bad faith." (Doc. No. 13 at 29). First, the issue of the BMW driver's "consent" to tow does not show bad faith or pretext. That Officer Eagle, during his interaction with the driver of the BMW, had to ask if his vehicle was disabled (because its damage was less visibly obvious), and if he

---

[2] Notably, law enforcement found no evidence of open alcoholic beverage containers or indications of spilled beer in the BMW as they did with Plaintiff's Chrysler.

needed a wrecker, does not make officers' decision to call a tow for Defendant more or less reasonable. This is especially true where, as here, the wreck caused the BMW to come to rest on the median—where it was not blocking an entire lane of traffic and as a result, the situation was less "urgent." Additionally, the driver of the BMW was calm, responsive, and cooperative in contrast with Defendant's erratic behavior.

Finally, contrary to Defendant's suggestion, the officers did not lie to Defendant about searching the BMW. During his exchange with Defendant, Officer Jackson made a statement to Defendant to the effect of "we had to take inventory on the BMW too." It is correct that at that time officers had not yet conducted the inventory search of the BMW. Officer Jackson made a misstatement, likely because he anticipated that one of the other officers had done or would do an inventory on the BMW consistent with CMPD policy. Additionally, according to Officer Jackson, when the wrecker company arrives on scene, it is not unusual for the tow driver made the decision as to which car to load first and sometimes, that meant a car was loaded before the inventory search was undertaken. Officer Jackson has also asserted that when he made that statement, law enforcement's attention was more focused on the Defendant because of his erratic and agitated behavior. Taking an inventory of the BMW was simply not a priority at that time. But the inventory search of the BMW was ultimately completed by Officer Eagle before it was towed.

Defendant also points to the brief deactivation of BWC as some suggestion of bad faith. Early in the investigation of the motor vehicle accident, Officer Eagle walked away from the Defendant to confer with Officer Jackson, who was standing farther down the road. As the Government notes, because the officers were not interacting with the public at that time, their brief deactivation of their BWC did not violate CMPD's BWC Directive, nor is this evidence of

bad faith or pretext. Officers Jackson and Eagle turned their BWC off to discuss investigative steps and strategy, as is permitted and encouraged pursuant to CMPD's BWC policy. While the BWC was off, and after the decision was made to tow and inventory the Chrysler, Officer Eagle told Officer Jackson that he thought he smelled alcohol on Defendant's breath and that Defendant was acting strangely and/or agitated. The officers then discussed behavioral markers or indicators warranting further investigation for alcohol-related offenses and decided to look around Defendant's disabled vehicle to see what could be seen in plain view. When officers deactivated their BWC the second time (for approximately 20 minutes), they were not interacting with the public, and instead were conducting administrative work in the cruiser, all while they were waiting on Hunter Wrecker to arrive to tow the two vehicles.

While officers did not provide a full statement as to why they were deactivating BWC in "real time" in either instance—this perceived "failure" is not sufficient to support Defendant's contention that officers violated the CMPD Directive, or to support his claim that they acted nefariously with respect to the accident investigation. Again—the law requires reasonableness, not perfection. See, e.g., United States v. Richardson, 229 F.3d 1145 (Table), 2000 WL 1273425, at *2 (4th Cir. 2000) (unpublished) (rejecting the defendant's argument that an inventory search was a pretext in part because the officers failed to produce an inventory list).

Defendant also suggests that the officers' failure to timely provide Defendant with a copy of his accident report at the scene is some evidence of an improper purpose. As the Government notes, no one received a copy of the accident report at the scene; CMPD officers do not hand out written accident reports at the scene of a motor vehicle wreck; and the officers at the scene advised Defendant to call his insurance company and explained to Defendant how to obtain a copy of the police report. Defendant's misperception that he did not timely receive a copy of the

accident report does not give rise to an inference of unreasonableness with respect to the officers' conduct.

Finally, Defendant complains that officers failed to investigate his allegation that an unidentified vehicle hit his vehicle on the side then fled the scene. This also has no bearing on the search's reasonableness. No other witness to the wreck saw or provided information related to an unidentified vehicle. With no actionable information, the officer's decision not to investigate the unidentified vehicle was reasonable, nor were the officers required to do so in the manner of Defendant's choosing.

## IV.    CONCLUSION

In sum, the Court finds that the seizure of the firearm in this case was the result of officers carrying out their community caretaking obligations in response to the investigation of a motor vehicle crash, which included making the reasonable decisions to: (1) order a tow for Defendant's disabled vehicle; and (2) perform a lawful inventory search for the protection of Defendant's property interests, as authorized by and consistent with CMPD written directives. Accordingly, the Court denies Defendant's motion to suppress.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress, (Doc. No. 13, 30), is **DENIED**.

Signed: December 13, 2024

Max O. Cogburn Jr
United States District Judge